Paul S. Banales, Esq.
Law Office of Paul S. Banales
2996 East Greenlee Street
Tucson, Arizona 85716
Tel: (520) 405-3135
Fax:(520) 300-1462
AZ Bar No.:004313
Pima Co. Bar No.: 2560
E-mail: psbanales@gmail.com

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| David Otto Schwake, <br><br> Plaintiff, <br><br> vs. <br><br> Arizona Board of Regents; Michael M. Crow; Kevin Cook; Norean Sablan; Ron Hicks; Gregory Castle; and Thomas Seager <br><br> Defendants. | Case No. CV-15-00696-PHX-SPL <br><br><br> FIRSTAMENDED COMPLAINT <br><br> (JURYTRIAL REQUESTED) |

For his First Amended Complaint, Plaintiff David Otto Schwake alleges the following:

**JURISDICTION AND VENUE**

1. This action arises under 42 U.S.C. § 1983, 20 U.S.C. § 1681(a), and the laws and U.S. Constitution. This Court has subject matter jurisdiction under 28 U.S.C. § 1331.

2. Venue is proper under 28 U.S.C. § 1391(b). All Defendants are sued in their official capacity and their official places of business are located within this District. Defendants Norean Sablan, Ron Hicks, Gregory Castle, and Thomas Seager are also being sued in their individual capacities. All of the acts or omissions giving rise to the claims occurred in this District.

**PARTIES**

3. Plaintiff David Otto Schwake (Plaintiff), who was pursuing a PhD in microbiology at Defendant Arizona State University, has given many presentations and published several papers on *Legionella* in water distribution systems from 2011 to the present.

4. Defendant Arizona Board of Regents is the governing board for Arizona State University. It is sued in its official capacity.

5. Defendant Michael M. Crow is the President of Arizona State University. He is sued in his official capacity.

6. Defendant Dr. Kevin Cook is the Dean of Students for Defendant Arizona State University. He is sued in his official capacity.

7. Defendant Norean Sablan is a senior Coordinator for the office of Student Rights and Responsibilities for Defendant Arizona State University. She is sued in both her official capacity and personal capacity.

8. Defendant Dr. Ron Hicks is the Associate Dean of Students for Defendant Arizona State University. He is sued in both his official capacity and personal capacity.

9. Defendant Dr. Gregory Castle is an English professor for Defendant Arizona State University. He is sued in both his official capacity and personal capacity.

10. Defendant Dr. Thomas Seager is an associate professor for Defendant Arizona State University. He is sued in both his official capacity and personal capacity.

**FACTUAL ALLEGATIONS**

11. In the summer and fall of 2014, Plaintiff was working towards completing his PhD in Microbiology in the School of Life Sciences at Arizona State University.

12. Plaintiff's dissertation work for his PhD focused on the study of *Legionella* bacteria in water distribution systems.

13. As part of his PhD graduate studies, Plaintiff had worked as a graduate student researcher in the lab of Dr. MortezaAbbaszadegan (Dr. A), located in the building

2

ISTB4, from March 2011 through December 2014.

14. His duties as a graduate student researcher included performing water microbiology research in an Arizona State University School of Life Sciences Laboratory, training new lab members for molecular and microbiology work, mentoring several undergraduate students, and writing requests for grants.

15. Plaintiff has become well known in his field as a promising up and coming young researcher whose work has been featured in hundreds of local, national and international news outlets.

16. Plaintiff has been invited to present his work at dozens of scientific meetings worldwide, has received nearly a dozen awards, and has arranged research collaborations with several groups, including a CDC lab.

17. Alleged victim Lauren McBurnett ("alleged victim") is another PhD candidate at Defendant Arizona State University who shared laboratory space with Plaintiff.

18. Alleged victim was home schooled and had never attended a public university before.

19. As part of his job duties, Plaintiff spent many hours assisting alleged victim in the lab because she had no previous lab experience.

20. Even with Plaintiff's assistance, alleged victim was experiencing difficulty producing research results of adequate quality in the Abbaszadegan lab.

21. Alleged victim competed in beauty pageants after turning 18 in February 2013. She effectively took time off from pursuing her studies at ASU from May – July 2014 to train for the Miss Arizona pageant by spending up to 40 hours per week on pageant training, more than she ever has for her lab work.

22. Between February 2013 and July 2014, Plaintiff and alleged victim had a relationship that oscillated between being professional coworkers and dozens of romantic encounters.

23. In conversations they had, alleged victim questioned whether or not she

should take time off from school to compete in pageantry. She often criticized Plaintiff for taking time away from her pageant training.

24. Alleged victim was clearly jealous of Plaintiff's professional development and seeming ease in which he performed his research. She was upset and resentful that Plaintiff, a lab mate, was more successful than she was.

25. When alleged victim learned that Plaintiff had been previously married, she filed a student disciplinary complaint against him in the Spring of 2013.

26. Alleged victim pursued and encouraged a friendly, then romantic, relationship with the Plaintiff after her initial complaint and then dropped her complaint.

27. In April 2014, the U.S. Department of Education began investigating Arizona State University for possible violations of Title IX in its handling of sexual violence complaints. The investigation is still ongoing.

28. Alleged victim was failing miserably in her coursework and lab work during the Fall 2014 semester.

29. On August 14, 2014, Plaintiff received a first notice letter from Defendant Norean Sablan (Defendant Sablan) stating that they had received information from alleged victim of "multiple instances of inappropriate behaviors and unwanted verbal and physical contact by you" that violates the ABOR Student Code of Conduct.

30. The letter stated that the following disciplinary charges were pending against Plaintiff: failure to comply with directions of university officials or agents; engaging in unwanted repeated or significant behavior toward another individual; and sexual misconduct.

31. The letter stated in bold print: "**Effective immediately, I am issuing you a no-contact directive for Lauren McBurnett. You are to have absolutely no contact whatsoever with Lauren. This no-contact directive includes, but is not limited to phone calls, texts, e-mails, voicemails, letters, cards, gifts, social media, or any other type of correspondence, and/or contact via friends or acquaintances. Be advised, failure to follow this no-contact directive will result in additional disciplinary action**

4

1  **taken against you."**

2  32. Plaintiff e-mailed Defendant Sablan's employee about whether he could attend a seminar or conference where alleged victim was at and was advised in a return e-mail: "At this time, separation is best. You will need to refrain from attending the seminars, making other arrangements if you are really needing information from them. For off-campus activities, it is still best practice to remove yourself from any situation where you find yourself in the same space as Lauren."

3  33. The letter required Plaintiff to attend a meeting with Defendant Sablan on August 15, 2014, where he would have an opportunity to provide additional information regarding the incident in question.

4  34. At the August 15 meeting with Defendant Sablan, Plaintiff requested a copy of the alleged victim's complaint, specific details about the complaint, and any other documents concerning the complaint. Defendant Sablan merely summarized the complaint verbally and never gave him the requested documents. She did suggest that he prepare any evidence or witnesses while the case was being investigated.

5  35. Despite Plaintiff's repeated requests, Defendants never provided him with a copy of the alleged victim's complaint or any other documents concerning the complaint.

6  36. Plaintiff told his advisor and immediate supervisor Dr. A about the no-contact directive. Dr. A. set up a lab sharing schedule so that Plaintiff and alleged victim would not be in the lab at the same time.

7  37. Plaintiff never violated the lab sharing schedule yet alleged victim violated it over twenty times between August 14 and October 15, 2014.

8  38. During this same time period, Plaintiff brought up work issues concerning alleged victim with Dr. A several times in person and email, mostly about her failing to abide by the lab sharing schedule.

9  39. On August 22, 2014, Plaintiff had a second meeting with Defendants Sablan where in they discussed further details of the accusations made by the alleged victim, focusing on the sexual misconduct. The Plaintiff requested documentation of the

5

accusations and information about the alleged victim's witnesses, both of which were denied to him by the Defendants. At the conclusion of the meeting, the Defendants explained to the Plaintiff that the disciplinary case would deal with "one accusation at a time" and requested a formal document from the Plaintiff outlining his story of the alleged sexual assault from the alleged victim's accusation. Within days, the Plaintiff provided Defendant Sablan with a four page document entitled "The Event" which presented his side of the most serious allegations from that he touched her breasts without her consent while she was asleep sometime between March 26 and 27, 2014.

40. In "The Event", Plaintiff made it clear that his relationship with the alleged victim was "on-again off again" for several months and that the intimate contacts between him and alleged victim were consensual. He also stated that several ASU students and staff members could support his claims. Text messages from the alleged victim to the Plaintiff were included which confirmed the sexual activity of the night of the accusation was consensual and that the two had a friendly and romantic relationship for several months afterwards.

41. Plaintiff also made it clear in "The Event" that "Lauren's initial account of the event delivered to your office contained several key inaccuracies to the point of being invalid" and "I regrettably feel it is possible she may have deliberately provided false information or left out key details with the intent to deceive in her report to your office."

42. On September 5, 2014, Plaintiff received a letter from Defendant Sablan informing him that he had been found responsible for violating all three Student Code of Conduct sections and that he was suspended until Fall 2017 effective immediately. He was never afforded an opportunity to provide evidence, witnesses, or his account of any of the additional accusations from the alleged victim.

43. The letter informed the Plaintiff that the decision to suspend was final unless he requested a hearing to review that decision based on the finding of responsibility or the sanction of suspension.

44. The letter further informed him that Chapter V, Section 5-403(D) of the ABOR Student Code of Conduct applied to the hearing.

45. Chapter V, Section 5-403(D) of the ABOR Student Disciplinary Procedures states that the student charged with misconduct may be assisted by an attorney, may cross-examine witnesses against him, and present witnesses and evidence at the hearing.

46. Shortly after September 5, 2014, Defendant Dr. Thomas Seager (Defendant Seager) loudly discussed Plaintiff's disciplinary case with a group of people in his office with the door open.

47. Defendant Seager went into great detail outlining alleged victim's accusations including privileged information and the disciplinary process and told them that Defendant Arizona State University had convicted Plaintiff of sexual assault and suspended him.

48. Defendant Seager also told them that the Plaintiff was not allowed in the ITSB4 building and if any of them saw him, they should immediately call the police.

49. Defendant Seager discussed the roles that William Barr, a witness the alleged victim called in for her complaint, and Troy Hottle played in Plaintiff's disciplinary proceeding.

50. The conversation went on for some time until Troy Hottle's advisor, Dr. Amy Landis, went to Defendant Seager's office and demanded that he stop talking about her students because it was inappropriate.

51. Defendant Seager may have continued the meeting even after Dr. Landis' demand.

52. Dr. Landis filed a formal, off-the-record complaint against Defendant Seager with their supervisor about the incident.

53. Throughout the 2014 fall semester, Defendant Seager continued to discuss Plaintiff and his disciplinary case.

54. Defendant Seager used Plaintiff's disciplinary case as a prompt for a discussion or project in his course by posing it as an example of a real-life scenario and

asking students how it should be handled.

55. Defendant Seager used Plaintiff's name and possibly the alleged victim's while disclosing confidential, graphic details about the alleged sexual assault and/or sexual harassment.

56. A number of students openly complained, questioning the appropriateness of using two current students involved in an ongoing disciplinary case for classroom discussion.

57. Defendant Seager may have dismissed their complaints and continued with the discussion.

58. Defendant Seager could only have obtained the detailed, graphic information on Plaintiff's disciplinary matter from Defendants Sablan, Hicks, Castle, and possibly others involved in the process.

59. Plaintiff hired Joseph Palmisano ("Palmisano") on or about October 1, 2014, to represent him at the upcoming hearing.

60. Palmisano faxed a letter to Defendant Dr. Kevin Cook (Defendant Cook) on October 2, 2014, in order to notify ASU that he was Plaintiff's attorney and that Plaintiff wanted a hearing to review the finding of responsibility and the sanction of suspension.

61. On October 12, 2014, Defendant Gregory Castle (Defendant Castle) e-mailed Plaintiff with questions concerning his upcoming hearing.

62. In a subsequent e-mail dated October 17, 2014, Defendant Castle wrote that he was aware that undersigned counsel represented Plaintiff.

63. On or around October 14, 2014, Plaintiff was informed by his TA coordinator that ASU School of Life Sciences was considering revoking his teaching assistanceship or prohibiting him from contact with his students because Defendant ASU School of Life Sciences felt that they would be held liable if one of his students filed a harassment complaint against him.

64. On October 14, 2014, alleged victim obtained an injunction against harassment in the San Marcos Justice Court which did not ban Plaintiff from going to Arizona State University, ISTB4 or the School of Life Sciences.

65. On October 15, 2014, Plaintiff's lab manager told him that alleged victim had directly contacted the director of the engineering school is lab is in and filed a complaint of some nature about the two of them sharing lab space even though their advisor Dr. A had already laid out an exclusive schedule that the Plaintiff never violated it and alleged victim had violated it over twenty times.

66. Defendant Hicks demanded Dr. A forbid Plaintiff from using his lab, but planned to "accommodate" him by allowing him to continue his research on *Legionella* bacteriain another lab on campus.

67. Defendants never did "accommodate" Plaintiff by allowing him to continue his research on *Legionella* bacteria in another lab on campus.

68. There are no other labs in Maricopa County where Plaintiff can continue his research due to the involvement of the specific deadly pathogen such as *Legionella* requiring specific equipment and safety certification.

69. On October 16, 2014, Plaintiff was removed from the lab without warning or explanation.

70. The nature of Plaintiff's research required him to frequently use samples and equipment exclusively stored in his lab where he is not allowed to go. He also would not be able to continue providing assistance to his lab mates and collaborators.

71. On October 18, 2014, alleged victim showed up at a tailgate party at Defendant ASU football stadium at which Plaintiff had already been present.

72. Plaintiff was served the injunction against harassment at the tailgate party shortly after alleged victim arrived.

73. Several people at the tailgate party approached Plaintiff and informed him that alleged victim would not stop talking about him. Plaintiff estimated that she talked to at least ten people.

74. On October 20, 2014, Plaintiff e-mailed his advisor Dr. A that the teaching lab key in possession of the alleged victim either needed to not be checked out under his name or returned to him and, in the meantime, should be left in the lab when not in use and not used directly by alleged victim. He also wanted Dr. A to relay a message to the administration in charge of the lab that he was requesting reasonable access to the building.

75. On October 24, 2014, Plaintiff received a letter from Defendant Hicks stating that the no contact directive with alleged victim was still in effect and that "Dr. Juergen Gadau will be in touch with you to provide an alternative work space until this matter has been finalized." Dr. Gadau is an administrator in the ASU School of Life Sciences.

76. On October 27, 2014, Plaintiff found out from another student in the lab that she is afraid of the alleged victim since alleged victim had damaged equipment, ruined supplies, and harassed a student lab mate since Plaintiff was kicked out of the lab.

77. This conversation prompted Plaintiff to mention the harassment to Dr. A about alleged victim's conduct which included the following: interfering with Plaintiff's experiments by manipulating his cultures/systems/supplies without permission, destroying data before Plaintiff had the chance to record them, knowingly placing experimental systems containing high concentrations of viable and pathogenic *Legionella* into non-BSL2 lab space, making false statements to Dr. A. and others, and interfering with a student lab mate's work and blaming her for problems caused by alleged victim. Plaintiff has evidence to back up these claims.

78. Plaintiff did not tell Dr. A about alleged victim's academic dishonesty which included the following: deliberately fabricating data, manipulating data, plagiarizing, and misrepresenting others' data. Plaintiff has evidence to back up these claims.

79. On November 3, 2014, Plaintiff received a letter from Defendant Hicks stating that they had received a report that he was seen in the lab on October 20, 2014,

after being told not to enter on October 16, 2014. Plaintiff was placed on interim suspension effective immediately. Plaintiff was also informed that the charge, if true, violated two provisions of the ABOR Student Code of Conduct. The letter informed Plaintiff that he had an appointment on November 5, 2014, to discuss the charges.

80. On November 5, 2014, Defendant Hicks summarized the allegations that alleged victim had made against him and that prompted him to investigate whether or not Plaintiff had broken the campus access restriction placed on him. He stated that he had retrieved keycard access records showing that Plaintiff entered a stairwell at the lab. Plaintiff made it clear to Defendant Hicks that entering the building was not a violation since his access was only restricted to certain rooms. Defendant Hicks remarked that further evidence in the form of CCTV footage might prove it and the suspension would remain in place while he continued his investigation. Plaintiff explained that he had work and research to conduct and Defendant Hicks reiterated that the suspension would stay in place until evidence showed that Plaintiff did not violate the access restriction.

81. On November 13, 2014, Ms. Laura Plough from the ASU security department sent an e-mail to Defendant Hicks which detailed the CCTV footage on Plaintiff's entry into ISTB4. The CCTV footage showed that Plaintiff entered a stairwell at the lab at 10:38 a.m., turning around after a few seconds, and exiting the building where he is observed at 10:40 p.m. getting into his car. The Plaintiff was forced to personally obtain this evidence and Defendant Hicks made no effort to do so.

82. Also on November 13, 2014, Plaintiff received a "Notice of Hearing and Charges" which stated that his hearing would take place on December 12, 2014. The Notice basically informed Plaintiff that he could present witnesses and other evidence and be represented by an attorney.

83. On November 14, 2014, Plaintiff sent an e-mail to Defendant Hicks requesting that his interim suspension be lifted effective immediately. He wrote: "My work has suffered an inordinate amount for an extended period of time, and it is perfectly reasonable to assume the work schedule set by Dr. Abbaszadegan at the beginning of the

semester would successfully prevent interaction between Lauren and myself."

84. Defendant Hicks responded that day: "I have received your request and will take it under advisement."

85. On November 23, 2014, Plaintiff e-mailed Defendant Hick asking for access to other campus buildings besides the Life Sciences buildings.

86. The next day, Defendant Hicks asked Plaintiff to provide him with the approximate dates and times that he would be accessing the buildings. Plaintiff responded that same day.

87. Defendant Hicks never responded to Plaintiff's November 24, 2014, e-mail.

88. On November 26, 2014, Plaintiff found out that Defendant Hicks forcibly withdrew Plaintiff's graduation application on November 21, 2014, a few weeks after the deadline to apply for graduation.

89. Without his degree, Plaintiff had to cancel his post-doctoral research position, another potential paid rotation, and couldn't make supplemental income as a community college lecturer.

90. Plaintiff also discovered that alleged victim had attempted to coerce members of the Abbaszadegan lab to testify on her behalf at the hearing by falsely telling them that other lab members had agreed to testify on her behalf.

91. On December 1, 2014, Plaintiff had a hearing on the injunction against harassment in the San Marcos Justice Court. The Justice of the Peace stated that he didn't believe that he had a right to keep Plaintiff from going to ASU and that he couldn't tell ASU what to do. The injunction against harassment remained in effect.

92. On December 3, 2014, Plaintiff had a meeting with Defendant Hicks at the ASU Police Station. Defendant Hicks stated that the reason behind the suspension punishment was to protect alleged victim by preventing contact and that the punishment wouldn't be necessary since the Plaintiff would be able to meet his graduation requirements. After talking to his counsel, they had come up with a "mutually beneficial compromise" that would allow Plaintiff to graduate: the punishment would be changed

1
2
3
4

to a three year campus access restriction to the building Plaintiff worked in and a ban from enrolling in coursework or holding any work/volunteer position related to ASU. Plaintiff would not be able to hold a post-doctoral position that Dr. A had offered him in the lab.

5
6
7

93.     Defendant Hicks then stated that as the case did not involve a suspension, expulsion, or degree revocation, Plaintiff was not entitled to a hearing and one would not be held.

8
9
10
11

94.     When Plaintiff protested, Defendant Hicks said the decision was final according to the ABOR Student Code of Conduct and his legal counsel.  When asked about any appeal process, Defendant Hicks stated "no" and that ASU "had no channels to do so."

12
13
14
15
16
17
18
19

95.     When Plaintiff asked Defendant Hicks if he would be able to file a complaint against alleged victim, Defendant Hicks stated that he was always able to do so.  Defendant Hicks became visibly upset and denied it when Plaintiff informed him that on multiple occasions he had previously told Plaintiff that he could not file a complaint against alleged victim until after the disciplinary hearing because it would be considered retaliatory.  Defendant Hicks then stated that submitting a complaint against the alleged victim could "lead to further investigations" resulting in additional sanctions against the Plaintiff, including degree revocation.

20
21
22

96.     On December 4, 2014, Plaintiff received a letter from Defendant Hicks which outlined the terms of his three year sanction of restricted access to campus until January 1, 2018, which are:

23
24
25
26
27

"You are **restricted from any access to ISTB 4** [the lab]**, and the BioDesign buildings.**  You are not to be **in or around** the two buildings for any reason.  If you have business to conduct you will need to make arrangements to conduct the business elsewhere.  If you are seen **in or around** ISTNB 4 or BioDesign you will be subject to citation or arrest for trespassing.

28

**You are restricted from holding any Post Doctorial, paid positions or**

**volunteer positions at ASU until the spring 2018 (January 1, 2018). In the meeting on December 3, 2014, you indicated that you had secured a Post Doctorial Position for the spring of 2015. You will not be allowed to maintain this position at ASU until the spring semester of 2018.**

**You are to have NO contact with Lauren McBurnette. This no contact includes direct, indirect, electronic (including social media and Youtube or similar sites) any contact with Lauren Mcburnette must be self reported to this office within 24 hours of the contact.**

This decision was based on all information gathered. This decision is final." (bold print in original)

97. Defendants' actions made it incredibly difficult for Plaintiff to complete and defend his dissertation defense.

98. Although Plaintiff did graduate, Defendants' actions halted Plaintiff's career at a critical time for a young scientist establishing himself in his field of research. Because of this time gap in his ability to research, Plaintiff is severely disadvantaged in applying for jobs and funding.

99. Defendants' actions ~~also~~ prevented Plaintiff and Dr. A from applying to ~~5~~ five funding opportunities worth millions of dollars, while also greatly reducing the quality of the single grant they did apply for in 2014, which will reduce the chance of them receiving the award.

100. Defendants' actions ruined four series of experiments that Plaintiff had begun prior to Fall 2014. This resulted in the loss of hundreds of hours of work already invested in the experiments and at least another thousand hours of follow-up work. Moreover, the loss of research prevented Plaintiff from seeking publication of his research and experiments. Publication is recognized as the main metric of research progress, and Plaintiff continues to receive professional criticism concerning his lack of publications over the last few years. This has and will continue to make it more difficult for Plaintiff to secure funding for further research.

101. Defendants' actions indirectly damaged the Plaintiff's personal property and research materials (wherein he owns partial intellectual property rights).

102. Defendants' actions indirectly caused known dangerous research materials, *Legionella* bacteria, to be managed inappropriately by alleged victim who placed hundreds of people at risk for contact with a deadly human pathogen. Plaintiff had the ultimate responsibility for the known dangerous research materials as they part of his experiments. Alleged victim's inappropriate management of the deadly human pathogen *Legionella* could negatively impact the lab and Plaintiff's career.

103. Due to Defendants' actions, seven national/international research collaborations (including one with CDC) were put on hold, potentially permanently.

104. Defendants' actions were incredibly damaging to Plaintiff's future career.Plaintiff lost out on a two- to three-year postdoctoral work opportunity and several research funding opportunities. Defendants' actions forced Plaintiff to cancel three collaborations during the Fall of 2014. These cancellations have done immeasurable harm to Plaintiff's reputation, as this had led to a reputation of being an unreliable research colleague, putting Plaintiff at a disadvantage for getting a job, receiving grants, and forming further collaborations

105. Defendant's actions have seriously damaged Plaintiff's personal reputation since he is considered a dangerous sex offender who cannot legally go back to the lab or hold any paid or volunteer position at Defendants ASU and School of Life Sciences until January 1, 2018. His students, lab mates, and the faculty at Defendants ASU and School of Life Sciences (and potentially many other academics outside ASU) are well aware that he is considered a dangerous sex offender who is banned until January 1, 2018.

106. Plaintiff has little chance of restarting his career at another university or research institute since the research community is small and close knit so that what happened at Defendant ASU will follow him wherever he goes. Even outside of this community, the allegations against Plaintiff remain a stain on his record that Plaintiff must attempt to explain when seeking future employment. Effectively, he may be

"blacklisted" from future jobs and funding due to Defendants' actions against him.

107. Because of Defendants' conduct described above, Plaintiff has been denied his constitutional rights. These actions have temporarily deprived Plaintiff of his education and research at ASU. Plaintiff continues to suffer deprivations, as the harm done to his reputation and research may effectively prevent Plaintiff from continuing in his chosen profession. Recently, it came to the Plaintiff's attention that he would be denied a job offer after the Defendants' actions, and this resulting lawsuit, came up on a background check completed by a potential employer.

108. In violating Plaintiff's constitutional rights, Defendants have and will continue to act under color of law.

109. An actual and substantial controversy exists between Plaintiff and Defendants as to their respective legal rights and duties. Defendants' conduct has resulted and will continue to result in irreparable injury to Plaintiff, including but not limited to further violations of his constitutional rights.

110. Plaintiff has no plain, speedy or adequate remedy at law to address the wrongs described herein.

## CLAIMS FOR RELIEF

### First Claim for Relief

### Violation of Constitutional Rights-42 U.S.C. § 1983

111. The above paragraphs are hereby incorporated by reference as though fully set forth herein.

112. Defendants Sablan, and Hicks intended to injure Plaintiff and acted with ill will, spite and an evil mind in depriving Plaintiff of his constitutionally protected liberty and property interests in his reputation, his continuing education, and his profession by banning him from the lab on August 14, 2014.

113. Defendants Sablan and Hicks' actions in banning Plaintiff from the lab violated Plaintiff's substantive and procedural due process rights under the U.S. Constitution.

114. Defendant Hicks intended to injure Plaintiff and acted with ill will, spite and an evil mind in depriving Plaintiff of his constitutionally protected liberty and property interests in his reputation, education, and profession when he changed Plaintiff's sanction of suspension to a campus access restriction, cancelled Plaintiff's hearing on the suspension scheduled for December 12, 2014, and informed Plaintiff that his decision was final and there was no appeal process for the campus access restriction.

115. Defendant Hicks' actions in changing Plaintiff's sanction, cancelling his previously scheduled hearing, and informing Plaintiff that his decision was final and there was no appeal process violated the ABOR Student Code of Conduct disciplinary procedures and violated Plaintiff's substantive and procedural due process rights under the U.S. Constitution since no due process was given to Plaintiff.

116. Defendant Gregory Castle (Defendant Castle) violated Plaintiff's substantive and due process rights under the U.S. Constitution when he communicated directly with Plaintiff despite knowing that Plaintiff was represented by an attorney.

117. Defendant Castle has a pattern of conduct in disciplinary cases wherein he communicates directly with students whose disciplinary charges are pending when he knows that they are represented by counsel.

118. Defendants Sablan, Hicks, and Castle either intentionally and knowingly or negligently disclosed confidential information about Plaintiff's disciplinary proceedings to Defendant Seager which violated Plaintiff's right to privacy under the U.S. Constitution.

119. Defendants Sablan, Hicks, and Castle intended to injure Plaintiff and acted with ill will, spite and an evil mind when they either intentionally and knowingly or negligently disclosed confidential information about Plaintiff's disciplinary proceedings to Defendant Seager which violated Plaintiff's right to privacy under the U.S. Constitution.

120. Defendant Seager knowingly and intentionally violated Plaintiff's right to privacy under the U.S. Constitution by continuingly disclosing confidential information

about Plaintiff's disciplinary proceedings to many people throughout the 2014 fall semester.

121. Defendant Seager intended to injure Plaintiff and acted with ill will, spite and an evil mind when he knowingly and intentionally violated Plaintiff's right to privacy under the U.S. Constitution when he kept disclosing confidential information about Plaintiff's disciplinary proceedings to many people throughout the 2014 fall semester.

## Second Claim for Relief
## Violation of Title IX-20 U.S.C. § 1681(a)

122. The above paragraphs are hereby incorporated by reference as though fully set forth herein.

123. ASU is a public university that receives federal financial assistance including Title IX funding. ASU School of Life Sciences is part of ASU and also receive federal financial assistance including Title IX funding. Defendant Arizona Board of Regents ("ABOR") administers the Title IX funding for ASU and ASU School of Life Sciences.

124. Defendants ABOR and ASU, through conduct of ASU and its employees, discriminated against Plaintiff on account of his gender in banning him from the lab, changing his sanction to on campus restriction, cancelling his hearing appealing the sanction, and informing him that he had no appeal process based solely on the alleged victim's complaint that he harassed her and committed sexual misconduct.

125. Throughout this series of events, Defendants ABOR and ASU displayed a pro-female, anti-male bias. Defendants Sablan and Hicks intentionally disregarded and ignored Plaintiff's written version of "The Event" which provided substantial evidence that he and alleged victim had an "on again off again" romantic relationship and that the encounter in question was clearly consensual.

126. Defendants ABOR and ASU, through Defendants Sablan and Hicks unreasonably, and against the weight of evidence, decided that alleged victim, a female,

18

was credible and that Plaintiff, a male, was lying, despite a lack of evidence to support either of these conclusions.

127. Defendants ABOR and ASU, through Defendants Sablan and Hicks further discriminated against Plaintiff based on his gender when they actively discouraged him from filing a complaint against alleged victim, explaining to Plaintiff that such an act would be considered retaliatory.

128. Defendants ABOR and ASU, through Defendant Seager discriminated against Plaintiff based on his gender when he violated the confidentiality of the student disciplinary process by intentionally and knowingly disclosing confidential information about Plaintiff's disciplinary case to many people during the 2014 fall semester.

129. Defendants ABOR and ASU, through Defendant Seager also discriminated against Plaintiff based on his gender when he falsely informed people that Plaintiff had been convicted of sexual assault and gave Plaintiff's name during discussions.

130. Male respondents in student disciplinary proceedings involving alleged sexual harassment and misconduct cases at Defendant ASU are discriminated against solely on the basis of sex. They are invariably found guilty, regardless of the evidence or lack thereof.

131. Plaintiff is aware of recent Defendant ASU student disciplinary cases against male respondents in alleged sexual misconduct cases who were all found guilty regardless of the evidence or lack thereof. The proceedings demonstrate a pattern of decision-making in which an anti-male bias permeates proceedings and results in male respondents at Defendant ASU being discriminated against solely on the basis of sex.

**DEMAND**

Plaintiff respectfully requests that the Court grant the following relief:
a. Enter a judgment awarding Plaintiff $20,000,000.00 in compensatory damages;
b. Enter a judgment awarding Plaintiff punitive damages in an amount to be determined by the Court or a jury;

c. Award attorneys' fees and costs of suit, plus interest, pursuant to 42 U.S.C. §1988; and

d. Grant such other relief as the Court deems just and proper.

Dated: July 10th, 2017.

By:   */s/ Paul S. Banales*
Paul S. Banales, Esq.
**Law Office of Paul S. Banales**
2996 East Greenlee Street
Tucson, Arizona 85716
Tel: (520) 405-3135
AZ Bar No.: 004313
Attorney for Plaintiff